**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

BRADLEY LEDURE,

      Plaintiff,

      v.

Case No. 3:17-cv-00737-JPG-GCS

UNION PACIFIC RAILROAD COMPANY,

      Defendant.

<u>**MEMORANDUM AND ORDER**</u>

**J. PHIL GILBERT, DISTRICT JUDGE**

Plaintiff Bradley LeDure was injured on the job. He then brought suit against his employer—Union Pacific Railroad Company—arguing that he is entitled to damages under the Federal Employers' Liability Act. The parties have now filed cross-motions for summary judgment, and in their aftermath, the Court **GRANTS** summary judgment in favor of Union Pacific.

**I.**     **BACKGROUND**

At 2:10 AM on a summer morning, Bradley LeDure—an engineer for Union Pacific Railroad Company—showed up for work at the train depot in Salem, Illinois. (LeDure Dep., ECF No. 49-1, 77:3–78:17.) LeDure's assignment that morning was a train that arrived the previous day and was now sitting on the "back track" of the depot: a dimly lit separate track that diverges from the main track at north end of the depot, runs around the back side of the yard, and reattaches back at the south end of the depot. (*Id.* at 79:13–21; 88:10–16; Steve Hotze Dep., ECF No. 55-2, 21:9–23:6.) This particular train had three locomotives—the cars that generate power to pull the entire train along—leading it. (LeDure Dep., ECF No. 49-1, 81:14–17.)

1

LeDure needed to do a few things with the train that morning. First, he needed to determine how many of the three locomotives should be powered on in order to provide enough juice for the train's next trip. (*Id.* at 77:15-22.) Second, he needed to physically enter the cab on each locomotive, turn the locomotive on or off according to how much power was needed, and place a tag indicating as such for the engineer at the next station. (*Id.* at 76:8–12; 77:8–14; 77:23–78:12.) And third, LeDure and some of his coworkers had to make a few moves in the yard to add and/or remove certain cars from the train to get it ready for its next trip. (*Id.* at 83:8–15.) So here, LeDure determined that only the first locomotive needed power, and he climbed aboard with his flashlight to begin the tagging process.

The problem in this case is that LeDure slipped while on the walkway of the third locomotive—owned by Union Pacific—allegedly leading to serious injuries of his "shoulders, spine, back, neck, left and right hand/fingers, and head[.]" (*Id.* at 98:18–99:17; Am. Compl. ¶ 11, ECF No. 22.) LeDure says that he did not see anything before his fall—and even that he stood right back up afterwards, entered the cab, and tagged it. (*Id.* at 105:8–13; 108:21–109.17.) LeDure then walked back to where he fell and "kind of lean[ed] over and get the light down closer to it [and] notice[d] that there was a little something there"—"a greasy or oil-type substance." (*Id.* at 85:5–6, 110:16–24.) LeDure specifically testified:

> **A. I don't know exactly what the substance was, but it was greasy like.**
>
> Q. Grease and oil are two different things. So I just want to make sure, are you saying it was like grease? Or was it more like oil?
>
> **A. I don't know what the substance was exactly. I have no idea to tell you if it was a certain substance or another substance.**
>
> Q. Did you reach down and touch it at all?
>
> **A. Yes.**

Q.   What did it feel like?

**A.   It was slick.**

Q.   So it felt like it was slick?

**A.   Uh-huh.**

Q.   So more like an oil?

**A.   I don't know. I don't know exactly what the substance was. I would be speculating to answer that question.**

(*Id.* at 85:5–24.)

LeDure then said that he did not know where the substance could have come from. (*Id.* at 6–10.) And a corporate designee for Union Pacific later confirmed that there were no components in the architecture of the locomotive near that area that could have leaked and caused the "slick spot." (Thomas Kennedy Dep., ECF No. 49-5, 42:1–12.) Regardless, LeDure continued with his morning duties, rearranged some cars on the train with a coworker, parked the train—and then reported his injuries to Union Pacific and went home. (LeDure Dep., ECF No. 192:12–194:7, 194:8–196:5, 84:16–85:1.)

Later, LeDure sued Union Pacific in this Court for violations of two interrelated statutes: (1) the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60; and (2) the Locomotive Inspection Act, 49 U.S.C. §§ 20701–03. LeDure's specific theories are numerous—he says that Union Pacific failed to maintain the train in a condition that was safe to operate; failed to adequately inspect the train; failed to provide him with a safe place, conditions, and equipment to work; failed to properly treat the floors of the train and provide secure footing; and more. Both parties have now filed cross motions for summary judgment.

## II.   LEGAL STANDARDS

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). When responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

III.    ANALYSIS

The two statutes at issue here—The Federal Employers' Liability Act (FELA) and the Locomotive Inspection Act—work in tandem. FELA is a "broad federal tort remedy for railroad workers injured on the job." *Crompton v. BNSF Ry. Co.*, 745 F.3d 292, 296 (7th Cir. 2014) (quoting *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1061 (7th Cir. 1998)). The standards are

simple: a plaintiff must prove the elements of negligence—duty, breach, cause, and harm—in order to prevail. *Id.* (citing *Fulk v. Illinois Cent. R.R. Co*., 22 F.3d 120, 124 (7th Cir. 1994)). But FELA comes with a gift to plaintiffs: their burden of proof on the element of causation is even lower than standard negligence. *CSX Transp., Inc. v. McBride,* 564 U.S. 685, 692 (2011). This standard of proof is so low, in fact, that the Seventh Circuit has repeatedly referred to it as "scarcely more substantial than pigeon bone broth." *Green v. CSX Transp., Inc*., 414 F.3d 758, 766 (7th Cir. 2005) (quoting *Harbin v. Burlington Northern R.R. Co*., 921 F.2d 129, 132 (7th Cir. 1990)).

The Locomotive Inspection Act, on the other hand, is a supplemental amendment to FELA that imposes specific duties on railroad carriers—and it does so by delegating authority to the Secretary of Transportation to promulgate regulations dealing with the safe "use" and operation of locomotives. 49 U.S.C. § 20701. *Ward v. Soo Line R.R. Co*., 901 F.3d 868, 873 (7th Cir. 2018), *reh'g denied* (Sept. 21, 2018). Specifically, if a plaintiff shows that a railroad carrier violated one of the corresponding regulations, then such a violation is negligence *per se* under the Federal Employers' Liability Act. *Coffey v. Ne. Illinois Reg'l Commuter R. Corp. (METRA)*, 479 F.3d 472, 474 (7th Cir. 2007). This means (1) a plaintiff does not need to prove that the violation proximately caused his injury; and (2) that the defendant may not argue that the plaintiff engaged in any contributory negligence. *O'Donnell v. Elgin, Joliet & Eastern Ry. Co*., 338 U.S. 384, 390 (1949); 45 U.S.C. §§ 53–54.

So FELA and the Locomotive Inspection Act work in harmony—a plaintiff can bring a broad negligence claim against a carrier under FELA, but at the same time bring a negligence per se claim against the carrier under the Locomotive Inspection Act if the carrier violated one of its corresponding regulations. And that is what LeDure does here. Count I alleges that Union Pacific violated the Federal Employers' Liability Act under theories of both simple negligence as well as

negligence *per se* pursuant to certain regulations under the Locomotive Inspection Act, while Count II directly alleges violations of the same Locomotive Inspection Act regulations mentioned in Count I. (*See generally* ECF No. 22.)

### A. The Locomotive Inspection Act

The first issue here is whether LeDure's Locomotive Inspection Act theory—which is predicated on violations of numerous U.S. Department of Transportation regulations—may proceed at all. The statute says:

> A railroad carrier **may use or allow to be used** a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—
>
>> (1) are in proper condition and safe to operate without unnecessary danger of personal injury;
>>
>> (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
>>
>> (3) can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C. § 20701 (emphasis added).

Accordingly, the locomotive in question must be "in use" at the time of the accident for the Locomotive Inspection Act to apply. *Lyle v. Atchison T. & S.F. Ry. Co.*, 177 F.2d 221, 222 (7th Cir. 1949), *cert. denied* 339 U.S. 913 (1950). "In other words, when a locomotive or car is in 'use on the line,' the mandatory duty of the carrier attaches; and, when the car or engine is not so 'in use,' then the duty under the express provision of the statute does not exist." *Id.*; *see also Wright v. Arkansas & Missouri R.R. Co.,* 574 F.3d 612, 620 (8th Cir. 2009); *Trinidad v. Southern Pac. Transp. Co.,* 949 F.2d 187, 189 (5th Cir. 1991); *Deans v. CSX Transp.*, Inc., 152 F.3d 326, 329 (4th Cir. 1998); *Brady v. Terminal R. Ass'n of St. Louis*, 303 U.S. 10, 13–14, 58 S.Ct. 426, 82 L.Ed. 614 (1938). This question is a matter of law for the Court to decide. *Steer v. Burlington Northern, Inc.*, 720 F.2d 975, 976 (8th Cir. 1983).

The problem, however, is that there is no clear-cut test to determine when a locomotive is "in use." The seminal Seventh Circuit case on the matter—dating back to 1949—asked whether "the use of the engine in transportation had for the time being been abandoned…[and] its use in commerce had come to an end." *Lyle*, 177 F.2d at 222. The locomotive in *Lyle* was in a roundhouse for inspection and repairs, so the Seventh Circuit instructed: "To service an engine while it is out of use, to put it in readiness for use, is the antithesis of using it." *Lyle*, 177 F.2d at 223. But since *Lyle* did not create any sort of concrete test or set of guidelines, federal district courts—and even state courts, which FELA grants concurrent jurisdiction to in certain circumstances—applying the case are all over the map. Both parties in this case accordingly point to an abundance of district court opinions in their favor, but given their sheer number and contrasting outcomes, none of them are very instructive.

Other United States Courts of Appeals are also all over the place. The Tenth Circuit has said that "in use" means "used in moving interstate or foreign traffic." *Estes v. Southern Pacific*, 598 F.2d 1195, 1198 (10th Cir. 1979). The Fourth Circuit has said that this is a totality of the circumstances test, but the most important factors are (1) where the train was located; (2) if the train was stationary, what time the train was scheduled to depart; and (3) what the injured party was doing at the time of the accident. *Deans v. CSX Transportation, Inc*., 152 F.3d 326, 329–30 (4th Cir. 1998). The First Circuit gets a bit more specific: if the locomotive is running on the yard track and ready to move into service, and the worker was injured while performing pre-departure inspection duties, then the locomotive is "in use." *McGrath v. Consolidated Rail Corp*., 136 F.3d 838, 842 (1st Cir. 1998). And the Fifth Circuit has the strictest test: the locomotive is not "in use" until it is fully assembled and the crew has completed those predeparture inspections. *Trinidad v. Southern Pacific Transportation Co*., 949 F.2d 187, 189 (5th Cir. 1991).

Here, after reviewing all of the circumstances in this case, Union Pacific's locomotive was not "in use" at the time of LeDure's accident. To harken back to the Seventh Circuit's first instruction: "To service an engine while it is out of use, to put it in readiness for use, is the antithesis of using it." *Lyle*, 177 F.2d at 223. And here, although LeDure was not repairing the locomotive in a roundhouse like in *Lyle*, LeDure was nevertheless putting the locomotive "in readiness for use" when he slipped: the train was (1) stationary; (2) on a backtrack in the depot yard; (3) had not yet been inspected or tagged; and (4) perhaps most importantly, the engineers had not yet assembled the cars on the train for its next use in interstate commerce. In fact, LeDure specifically said at his deposition that "the train was not set up and ready to go." (LeDure Dep., ECF No. 49-1, 83:9–10.) LeDure later explained just how much work needed to be done before the train would be ready for its next use in interstate commerce:

> Q.   Just tell me what switching you did that morning.
>
> **A.    I can't recall if we set out or we picked up, but we had to make a couple of moves on a couple of different tracks and then put our train back together.**
>
> Q.    Were you able to do that safely?
>
> **A.    I thought I did, yes.**
>
> Q.    So how many different moves did you have to make to do that switching?
>
> **A.    I would be estimating because I don't recall exactly.**
>
> Q.    What is your estimate?
>
> **A.    More than three.**

(*Id.* at 193:18–194:7.) There was still a considerable amount of work to be done before this locomotive was ready for its next trip in interstate commerce, and that is the "antithesis of using it." *Lyle*, 177 F.2d at 223.

And these facts would lead to the same conclusion in other circuits. *Trinidad*, 949 F.2d at 189 (locomotive not "in use" when the train was not yet fully assembled); *McGrath*, 136 F.3d at 842 (locomotive not "in use" if the train is not ready to move into service); *Estes v. Southern Pacific*, 598 F.2d at 1198 (locomotive not "in use" if it is not moving interstate traffic). Even *Deans v. CSX Transportation, Inc.*, 152 F.3d 326 (4th Cir. 1998)—which LeDure relied on heavily at oral argument—does not compel a different conclusion: there, a train was "in use" even when sitting on a back track, but only because it was ready for "imminent departure." 152 F.3d at 330. Here, LeDure's own testimony demonstrates that the train was not close to ready for "imminent departure" when he slipped—there was still a considerable amount of prep work to be done.

Since the locomotive was not "in use" at the time of the accident, there is a lot of collateral damage to the rest of the motions and the complaint in this case. 49 U.S.C. § 20701—the opening bit of the Locomotive Inspection Act—instructs that a locomotive must be "in use" for it to apply, and then delegates authority to the Secretary of Transportation to promulgate regulations to implement the statute. But since the locomotive here was not "in use," none of those regulations apply to this case. This means that the Court must dismiss the entirety of Count II of the first-amended complaint, as well as ¶¶ 10(e)–(i) of Count I—which are all predicated on Department of Transportation regulations promulgated pursuant to the Locomotive Inspection Act. Moreover, any further arguments in the motions pertaining to the regulations—such as whether 49 C.F.R. § 229.119(c) applies to exterior walkways; or whether LeDure is entitled to partial summary judgment based on Union Pacific's alleged violation of any of the regulations (ECF No. 50)—are moot. This also extends to Union Pacific's motion regarding the tread patterns on the locomotive walkway (ECF No. 46): the company had argued that the regulations preclude LeDure from arguing that Union Pacific should have installed a different tread design on the walkways, because

such a theory is actually a design defect claim. LeDure had responded that he is not brining a design defect claim, but is simply arguing that 49 C.F.R. § 229.119(c) requires railroads to properly treat locomotive floors—and Union Pacific failed to do so. But since the regulations do not apply to this case, all of that it moot as well.

### B.   The Federal Employers' Liability Act

Even though the locomotive was not in use, LeDure still may have recourse under the Federal Employers' Liability Act—and all he has to do is show that Union Pacific is liable in standard negligence in order to prevail. *Crompton*, 745 F.3d at 296. Union Pacific argues that they are entitled to summary judgment on this theory as well because LeDure's injury was not reasonably foreseeable—basically, that LeDure has not demonstrated "circumstances which a reasonable person would foresee as creating a potential for harm." *Holbrook v. Norfolk Southern Railway Co.*, 414 F.3d 739, 742 (7th Cir. 2005). LeDure can do this in two ways: he can show that (1) Union Pacific had actual notice of the condition—meaning that they knew about the risk and failed to act—or (2) Union Pacific had constructive notice of the condition—meaning that they could have taken reasonable steps ahead of time to learn about the condition, but failed to do so. *Id.*; *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 651 (7th Cir. 2014).

LeDure can do neither, in a very similar vein to *Holbrook*. There, an employee for Norfolk Southern was injured when he slipped while climbing a ladder. And once he hit the ground, he noticed "a sticky, oily substance on the rung, which he wiped off with a paper towel." 414 F.3d at 741. Holbrook then sued Norfolk Southern under FELA, and although he did "not know whether the substance was on the ladder before he came to it or [if he] tracked [the oil] onto it from somewhere else," Holbrook claimed that the substance must have come from the train yard where there sometimes were pools of oil on the ground. *Id.* So Holbrook first argued that Norfolk

Southern had actual notice of the condition because of those occasional pools of oil in the yard that everyone knew about, but the Seventh Circuit rejected that—stating "Holbrook simply offers no evidence that he was in the vicinity of an accumulated oil pool on the day of the accident, or that any such accumulation even then existed [on that particular day]," so "it would not be reasonable to infer that putative pools of accumulated oil in the Elkhart Yard played a part in Holbrook's injury." *Id.* at 744.

And here, there is also no evidence that Union Pacific had actual notice of the "greasy or oil-type substance" that LeDure slipped on. In fact, LeDure himself could not identify the source of the substance or even what it was: he said "I don't know what the substance was exactly. I have no idea to tell you if it was a certain substance or another substance." (LeDure Dep., ECF No. 49-1, 85:11–13.) And there is no evidence that Union Pacific saw this substance before LeDure did—even LeDure did not see it until he brought himself to "kind of lean over and get the light down closer to it to notice that there was a little something there." (*Id.* at 110:16–24.)

So LeDure instead relies on a theory of constructive notice—namely that Union Pacific should have inspected the locomotive before they sent LeDure out to work on it. But the employee in *Holbrook* brought a similar argument, yet the Seventh Circuit very quickly rejected that one as well. In *Holbrook*, Norfolk Southern failed to catch the alleged slick spot during their last inspection, but the Seventh Circuit reasoned:

> [A]ccording to the plaintiff, if the grease was on the ladder before he came to it, the inspectors should have discovered it. However, there is absolutely no evidence that the grease was on the ladder before Holbrook stepped on it. And even assuming that the grease was on the ladder before Holbrook stepped on it, there are a myriad of possible ways the substance could have gotten onto the ladder between the railcar's inspection and its contact with Holbrook (*e.g.,* splatter from a passing train on adjacent tracks, residue from mounting by another employee). Holbrook himself conceded that, if the dab of grease was on the ladder before he stepped on it, it could have attached sometime after the car's inspection. Because plaintiff's constructive notice argument "rests on mere speculation and conjecture," it too must fail. *See*

> *Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330 (4th Cir. 1998) (affirming grant of summary judgment against FELA plaintiff where plaintiff "introduced no evidence to show that an earlier inspection would have revealed or cured the [defective condition], or that the railroad had notice of the defect prior to the accident").

414 F.3d at 744–45.

The facts here are nearly identical: LeDure has introduced no evidence that the small slick spot was on the walkway before he stepped on it—which is especially concerning considering he testified that he wears the very same work boots around his farm. (LeDure Dep., ECF No. 49-1, 173:22–174:3.) And even assuming that the spot was there before he stepped on it, "there are a myriad of possible ways the substances could have gotten onto" the walkway, just as outlined in *Holbrook*. 414 F.3d. at 475. And what is more, LeDure also testified that he "did not see anything that looked like it was coming out of the engine compartments"—making his theory even more hazy. (LeDure Dep., ECF No. 49-1, 87:16–20.) The same was confirmed by Union Pacific's corporate designee, who testified that there were no components in the architecture of the locomotive near that area that could have leaked and caused the slick spot. (Thomas Kennedy Dep., ECF No. 49-5, 42:1–12.)

And although this case is factually distinguishable from *Holbrook* on the grounds that the inspection here had not occurred yet, it does not make any difference—LeDure's constructive notice argument still would rest on "on mere speculation and conjecture" that an inspection would have turned something up—which is doubtful considering how difficult it was for LeDure to find this slick spot in the first place. *Id*. Just as the Fourth Circuit said in *Deans*—a case that LeDure relied heavily on at oral arguments—summary judgment is proper when a plaintiff "introduced no evidence to show that an earlier inspection would have revealed or cured the [defective condition]." *Deans*, 152 F.3d at 330. And that is exactly what happened here—LeDure has

introduced no evidence to show that an earlier inspection would have revealed this small, mysterious "slick spot." So LeDure's standard negligence theory under FELA fails as well.

## CONCLUSION

For the foregoing reasons, the Court:

- **GRANTS** Union Pacific's motion for summary judgment (ECF No. 48);

- **FINDS AS MOOT** Union Pacific's motion for summary judgment on any claims regarding the tread pattern on the locomotive walkway (ECF No. 46);

- **FINDS AS MOOT** LeDure's motion for partial summary judgment (ECF No. 50);

- **FINDS AS MOOT** any other pending motions;

- **DISMISSES** this case **WITH PREJUDICE**; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:  JANUARY 31, 2019**

<u>s/ *J. Phil Gilbert*</u>
**J. PHIL GILBERT**
**DISTRICT JUDGE**